UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

RANDY WHITE o/b/o K.R.W.,

                                 Plaintiff,

v.

COMMISSIONER OF SOCIAL SECURITY,

                                 Defendant.
_____

<u>DECISION AND ORDER</u>

18-CV-193L

## PRELIMINARY STATEMENT

Plaintiff Randy White ("White"), on behalf of his minor nephew, K.R.W., who was born on April 22, 2005, appeals from a denial of Children's Supplemental Security Income ("SSI") by the Commissioner of Social Security (the "Commissioner"), based on the Commissioner's finding that K.R.W. was not disabled. This action is one brought pursuant to 42 U.S.C. § 405(g) to review the Commissioner's final determination.

On February 6, 2014, White protectively filed an application for Children's SSI, alleging disability as of January 1, 2013. (Tr. 72, 160-65).[1] On June 2, 2014, the Social Security Administration denied White's application, finding that K.R.W. was not disabled. (Tr. 80-85). White requested and was granted a hearing before an administrative law judge. (Tr. 92-100). Administrative Law Judge Scot Gulick (the "ALJ") held the hearing via videoconference on June 22, 2016. (Tr. 41-65). In a decision dated July 25, 2016, the ALJ found that K.R.W. was not

---

[1] References to page numbers in the Administrative Transcript (Dkt. # 6) utilize the internal Bates-stamped pagination assigned by the parties.

disabled and was not entitled to SSI. (Tr. 23-40). On December 6, 2017, the Appeals Council denied White's request for a review of the ALJ's decision, making the Commissioner's decision final. (Tr. 1-6). White then commenced this action on February 5, 2018, seeking review of the Commissioner's decision. (Dkt. # 1).

Currently pending before the Court are the parties' cross motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. (Dkt. ## 12, 15). For the reasons set forth below, White's motion (Dkt. # 12) is granted to the extent that this the matter is remanded for further proceedings consistent with this decision, and the Commissioner's cross motion (Dkt. # 15) is denied.

## DISCUSSION

### I. Relevant Standards

Because K.R.W. is a child, a particularized, three-step sequential analysis is used to determine whether he is disabled. First, the ALJ must determine whether he is engaged in substantial gainful activity. *See* 20 CFR §416.924. If so, he is not disabled. If not, the ALJ proceeds to step two, and determines whether the child has an impairment, or combination of impairments, that is "severe" within the meaning of the Act. If not, the analysis concludes with a finding of "not disabled." If so, the ALJ continues to step three. At step three, the ALJ examines whether the child's impairment meets, medically equals, or functionally equals a presumptively disabling condition listed in Appendix 1 of Subpart P of Part 404 of the relevant regulations (the "Listings"). If the impairment meets or medically equals the criteria of a Listing and meets the durational requirement – that is, if the child's impairments are functionally equivalent in severity

to those contained in a Listing – she is disabled. If not, she is not disabled. *See* 20 C.F.R. §§ 416.924(b)-(d).

In assessing whether a child's impairments or combination of impairments meet, medically equal, or functionally equal one of the Listings, the ALJ must measure the child's limitations in six domains: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for himself; and (6) health and physical well-being. *See* 20 C.F.R. §§ 416.926a(b)(1)(i)-(vi). Medically determinable impairments will be found to equal a Listing where they result in "marked" limitations in two or more domains of functioning, or an "extreme" limitation in one or more. 20 CFR §§416.926a(a), (d). A "marked" limitation is one that is "'more than moderate' but 'less than extreme'" and that "interferes seriously with [a child's] ability to independently initiate, sustain, or complete activities." *Id.* at § 416.926a(e)(2)(i); *see also Spruill ex rel. J.T. v. Astrue*, 2013 WL 885739, *5 (W.D.N.Y. 2013). An "extreme" limitation is "more than marked" and one which "interferes very seriously with [a child's] ability to independently initiate, sustain or complete activities." 20 C.F.R. § 416.926a(e)(3)(i).

The Commissioner's decision that K.R.W. is not disabled must be affirmed if it is supported by substantial evidence, and if the ALJ applied the correct legal standards. *See* 42 U.S.C. §405(g); *Machadio v. Apfel*, 276 F.3d 103, 108 (2d Cir.2002).

## II. The ALJ's Decision

The ALJ initially found that K.R.W. had the severe impairments of attention deficit hyperactivity disorder ("ADHD"), mood disorder, and bipolar disorder. (Tr. 26). The ALJ proceeded to analyze whether K.R.W. had "marked" or "extreme" limitations in any of the six

3

domains of functioning. Based on the medical, educational and testimonial evidence presented, the ALJ concluded that since February 6, 2014, K.R.W. has had marked limitation in attending and completing tasks, less than marked limitation in acquiring and using information and interacting and relating with others, and no limitation in moving about and manipulating objects, caring for himself, and health and physical well-being. (Tr. 31-36). The ALJ accordingly concluded that K.R.W. is not disabled. (Tr. 36).

### III. White's Contentions

White argues that the ALJ's decision that K.R.W. is not disabled is not supported by substantial evidence and is the product of legal error. (Dkt. ## 12, 16). First, White argues that the ALJ relied on stale medical opinion evidence in assessing K.R.W.'s level of functioning in the domains of attending and completing tasks, interacting and relating with others, and caring for self. In White's view, this evidence did not account for the subsequent worsening of K.R.W.'s symptoms. (Dkt. # 12-1 at 10-12). Second, White contends that the ALJ failed to adequately explain why he rejected the "serious" limitations opined by Jessica Korzelius ("Korzelius"), K.R.W.'s fifth grade ELA and social studies teacher, in her April 15, 2016, teacher questionnaire, while at the same time accepting Korzelius's less severe limitations. (*Id.* at 12-14). According to White, Korzelius's opinion was the "only opinion in the record that could have constituted an accurate assessment of [K.R.W.'s] functioning[.]" (*Id.* at 12).

### IV. Analysis

As stated above, the ALJ determined that K.R.W. had marked limitations in the domain of attending and completing tasks, less than marked limitations in the domain of interacting and

relating to others, and no limitations in the domain of caring for self. (Tr. 33-35). In reaching this determination, the ALJ reviewed K.R.W.'s medical and educational records, including various medical opinions and teacher questionnaires.

Specifically, the ALJ gave "great weight" to the opinion of consultative psychologist Christine Ransom ("Ransom"), PhD, who completed a child/adolescent psychiatric evaluation of K.R.W. on April 21, 2014. (Tr. 294-97). At that time, K.R.W. was in a regular education setting in the third grade and received counselling at school, but was "soon [to be] switched to special education for emotional problems." (Tr. 294). Ransom indicated that K.R.W. was receiving one-to-one counselling for the two months prior to her evaluation at Genesee County Mental Health for ADHD and bipolar disorder, and had been on medication for ADHD and bipolar disorder for the prior two years. (*Id.*). As a result of his medication, K.R.W.'s ADHD in April 2014 was "in remission," and Ransom noted that K.R.W.'s bipolar disorder "ha[d] improved quite a bit with medication and one-to-one counseling," such that he was "more able to control his moods using coping strategies with the help of the medication to reign in the mood swings." (*Id.*).

Ransom indicated that the results of K.R.W.'s mental status examination were largely normal. (Tr. 295-96). K.R.W. appeared cooperative and was socially appropriate. (Tr. 295). His mode of dress was neat, casual and appropriate with adequate hygiene and grooming, and he had normal motor behavior, posture and appropriate eye contact. (*Id.*). K.R.W.'s speech was fluent and intelligible, and his thought processes were coherent and goal-directed. (*Id.*). He expressed a full range of affect, demonstrated a neutral mood, had clear sensorium, was fully oriented, and had intact attention and concentration. (*Id.*).

In terms of mode of living, Ransom noted that K.R.W. could dress, bathe and groom himself at age appropriate levels, that he was "getting along fairly well with friends now that mood

swings [were] reigned in," and that he was "able to follow instructions to complete tasks as requested by his custodial uncle now that he [was] on medication." (Tr. 296). Based on her examination, Ransom opined that K.R.W. "will have mild difficulty attending to, following and understanding age appropriate directions, complet[ing] age appropriate tasks, adequately maintain[ing] appropriate social behavior, respond[ing] appropriately to changes in the environment, learn[ing] in accordance with cognitive functioning, ask[ing] questions and request[ing] assistance in an age appropriate manner, be[ing] aware of danger but tak[ing] needed precautions, [and] interact[ing] adequately with peers and adults." (*Id.*). In Ransom's view, these areas of difficulty were "secondary to bipolar disorder," but K.R.W.'s prognosis was fair to good with continued treatment. (*Id.*).

The ALJ also gave "great weight" to the opinion of non-reviewing state agency medical consultant Jennifer Meyer ("Meyer"), MD, who completed a review of the record on May 29, 2014. (Tr. 72-79). Meyer opined that K.R.W. had marked limitations in the domain of attending and completing tasks and less than marked limitations in the domain of interacting and relating with others. (Tr. 76). It is evident that Meyer based her opinion in part on Ransom's consultative opinion, as well as the teacher questionnaire completed by K.R.W.'s third grade reading teacher, Meghan Cipollone ("Cipollone")[2], on March 18, 2014 (to which the ALJ afforded "some" weight). (Tr. 30, 76, 188-95).

According to Cipollone's questionnaire, K.R.W. was most limited in the domain of attending and completing tasks. In Cipollone's view, K.R.W. had a "very serious problem" on a daily basis with refocusing to task when necessary, changing from one activity to another without

---

[2] The ALJ referred to this teacher as "Meghan Apollone" (Tr. 30), but both parties refer to her as "Meghan Cipollone" (Dkt. ## 12-1 at 4; 15-1 at 16). For purposes of consistency, the Court will also refer to her as "Meghan Cipollone."

6

being disruptive, and working without distracting self or others. (Tr. 190). K.R.W. also had a "serious problem" on a daily basis with paying attention when spoken to directly, focusing long enough to finish assigned activities or tasks, carrying out multi-step instructions, and completing work accurately without careless mistakes, and with working at a reasonable pace/finishing on time on a weekly basis. (*Id.*). In addition, K.R.W. had an "obvious problem" on a weekly basis with waiting to take turns, organizing his own things or school materials, and completing his work accurately without careless mistakes, and with carrying out single-step instructions on a daily basis. (*Id.*). Cipollone noted that K.R.W. was "very distracted" during small group instruction and "often disruptful to other students," and that K.R.W. was "given many reminders to remain on task and [was] redirected frequently." (*Id.*).

In the domain of interacting and relating with others, Cipollone indicated that K.R.W. had a "serious problem" on a weekly basis seeking attention appropriately, and with taking turns in a conversation on a daily basis. (Tr. 191). K.R.W. also had an "obvious problem" on a weekly basis following rules, respecting/obeying adults in authority, relating experiences and telling stories, using language appropriate to the situation and listener, introducing and maintaining relevant and appropriate topics of conversation, and using adequate vocabulary and grammar to express thoughts/ideas in a general, everyday conversation. (*Id.*). Cipollone noted that it was necessary to implement a behavior modification strategy for K.R.W. (*Id.*).

White argues that the 2014 opinions of Ransom and Meyer, and Cipollone's 2014 questionnaire, are stale because they do not account for the concerns raised over K.R.W.'s behavioral and disciplinary issues, which increased towards the end of 2015 and continued through the spring of 2016. Generally, "an ALJ should not rely on 'stale' opinions – that is, opinions rendered before some significant development in the claimant's medical history," *Robinson v.*

*Berryhill*, 2018 WL 4442267, *4 (W.D.N.Y. 2018), and "[m]edical source opinions that are stale and based on an incomplete medical record may not be substantial evidence to support an ALJ['s] finding," *Davis v. Berryhill*, 2018 WL 1250019, *3 (W.D.N.Y. 2018) (alterations, citations, and quotations omitted). *See also Whitehurst v. Berryhill*, 2018 WL 3868721, *4 (W.D.N.Y. 2018) ("a medical opinion may be stale if subsequent treatment notes indicate a claimant's condition has deteriorated"). In determining whether opinion evidence is "stale," the "relevant issue is whether [claimant's] condition *deteriorated* during [the relevant] period." *Best v. Berryhill*, 2019 WL 1146341, *3 (W.D.N.Y. 2019) (emphasis in original).

The record contains rather significant evidence that K.R.W. experienced increased behavioral issues during the fifth grade in 2015-2016. For example, at an October 7, 2015, psychotherapy session with Lisa Clattenburg ("Clattenburg"), LMSW, at Genesee County Mental Health Clinic, K.R.W.'s mother reported "an increase in behavioral issues and defiance both at home and at school," that K.R.W. had received "[two] days of [in-school suspension] and was sent home another day since school started." (Tr. 343). Clattenburg noted that K.R.W. was "polite [and] engaged well" with her after his mother left the room, and that K.R.W. "seem[ed] to be primarily angry with his mother." (*Id.*). On November 30, 2015, although reporting no behavioral issues at school, K.R.W.'s mother reported to Clattenburg that she had to contact the police "because she felt as though she could not control [K.R.W.'s] temper." (Tr. 346).

On December 11, 2015, K.R.W.'s mother indicated that K.R.W. had been behaving better at home and had joined the wrestling team at school, however, he had "been having behavioral issues at school and [was] often defiant towards teachers." (Tr. 349). The school was "threatening to place [K.R.W.] on PINS [i.e., person in need of supervision] or refer [him] to STAR if he d[id]

8

not improve [his] behavior soon." (*Id.*).[3] Later that month, on December 31, 2015, Clattenburg noted that K.R.W. continued "to experience behavioral issues at home and at school [and that he had] received detention for his poor attitude and defiant behavior." (Tr. 356).

On February 17, 2016, K.R.W.'s mother reported to Clattenburg that his "behavioral issues ha[d] increased since he was seen last." (Tr. 359). At school, he had received 27 disciplinary referrals and was "in the process of being petitioned for PINS and a [one] day STAR trial." (*Id.*). By March 8, 2016, psychiatric nurse practitioner Amanda Lewis ("Lewis") at Genesee County Mental Health Clinic noted that K.R.W. had 28 disciplinary referrals, that he was "on PINS," and had completed a one-day trial at STAR. (Tr. 363). K.R.W.'s mother had also needed to call the police again "due to [K.R.W.'s] aggression." (*Id.*). Lewis noted that K.R.W.'s school was concerned "about [his] level of aggression and 'explosions,'" and suggested that "medication be added." (*Id.*). His teachers also apparently reported that K.R.W. was "off the wall," and the school was "pushing for probation as he ha[d] threatened female peers at school." (*Id.*). Lewis noted that K.R.W.'s "issues [were] primarily behavioral and w[ould] not be greatly impacted by medication," and that "a pill w[ould] not 'control' him or his behavior." (Tr. 365).

As the ALJ noted, these treatment notes are consistent with Korzelius's April 15, 2016, teacher questionnaire, which the ALJ assigned "some weight." (Tr. 31, 266-73). According to Korzelius, in the domain of interacting and relating with others, K.R.W. had a "serious problem" on a weekly basis with expressing anger appropriately and respecting/obeying adults in authority.

---

[3] According to White, a person in need of supervision is "a person less than eighteen years of age who does not attend school in accordance with New York State Education Law or who is incorrigible, ungovernable or habitually disobedient and beyond the lawful control of a parent or other person legally responsible for such child's care, or other lawful authority, or who violates the provisions of New York State Penal Law." (Dkt. # 12-1 at 10 n.1 (citations omitted)). In addition, the STAR – student transition and recovery – program is "a disciplinary program for schools and juvenile courts that is designed to provide supervision, educational support, behavioral modification and many other positive developmental activities that are a high-risk of out-of-home placement." (*Id.* at 10 n.2 (quotations and citations omitted)).

9

(Tr. 269). Notably, in comparison, Cipollone indicated in 2014 that K.R.W. did not have any problems with expressing anger appropriately and had a "moderate" problem respecting/obeying adults. (Tr. 191). Korzelius also indicated that K.R.W. had a "moderate problem" on a weekly basis playing cooperatively with other children and using language appropriate to the situation or listener, with following rules on a monthly basis, and with interpreting meaning of facial expression, body language, hints, and sarcasm on a daily basis. (*Id.*). Korzelius noted that K.R.W. needed "[e]xtra wait time to follow directions, warnings before there [was] a change in plans/schedule, [and] movement breaks," and that he needed "extra reminders and support during independent work time." (*Id.*).

In addition, White emphasized K.R.W.'s behavioral issues when he testified at the hearing before the ALJ on June 22, 2016. According to White, K.R.W. had behavioral issues "in various aspects of his life, both in school, any athletics he attends, [and] camp." (Tr. 45). White testified that K.R.W. would frequently break things during angry outbursts and was "sometimes" violent with other people. (Tr. 46). White also testified that there were "a couple incidents" that put K.R.W. in the STAR program, which K.R.W. began in April 2016. (Tr. 51-52). The "major incident" occurred when K.R.W. tried to put peanut butter in the food of a classmate who was apparently allergic to peanut butter, and a secondary incident occurred when "he had put his hand in his pants and pulled it out and asked another student to smell it." (Tr. 52).

In the Court's view, these well-documented, significant instances of behavioral and disciplinary issues in 2015-2016 call into question the reliability of the medical opinions and teacher questionnaire in the record from 2014, particularly in the domain of interacting and relating with others.[4] *See, e.g., Young o/b/o M.A.G.L.F.*, 2017 WL 5789996, *5 (W.D.N.Y. 2017) ("The

---

[4] The domain of interacting and relating with others considers "how well [the child] initiate[s] and sustain[s] emotional connections with others, develop[s] and use[s] the language of [his or her] community, cooperate[s] with others,

combination of [claimant's] lengthy out-of-school supervision by the teacher who wrote that she and [claimant] 'have a great relationship' . . . and the doctor's concern that [claimant's] medication needed adjustment yet again due to 'impulsivity' in the afternoons, leads the [c]ourt to question the ALJ's reliance on the medical and teacher evaluations that pre-date the series of disciplinary problems that increased starting in October 2013, culminating in the seven-day out of school suspension in May and June 2014.").

Moreover, while the ALJ acknowledged to some degree the increase in K.R.W.'s behavioral issues, he failed to adequately resolve conflicts in the record created by those issues. For example, as noted above, Ransom opined in 2014 that K.R.W.'s bipolar disorder was "currently mild," that his ADHD was "currently in remission on medication," and that his mood swings were "reigned in." (Tr. 296). The ALJ, in assigning Ransom's opinion "great weight," stated that "[w]hile more recent evidence than Dr. Ransom's opinion [was] on file, that evidence does not tend to contradict her conclusions. Rather, the most recent evidence on file generally demonstrates progress with treatment and overall symptom stability." (Tr. 30). It is unclear to the Court how K.R.W.'s subsequent, significant behavioral and disciplinary issues "do[] not tend to contradict" Ransom's conclusions – upon which Meyer also relied in rendering her opinion.

In addition, in specifically discussing K.R.W.'s limitations in the domain of interacting and relating with others, the ALJ relied upon educational records from K.R.W.'s second, third, and fourth grades, which necessarily did not include his increased behavioral or disciplinary issues from the fifth grade, discussed above. (Tr. 24 (citing Tr. 249-64)). The ALJ's failure to adequately resolve these conflicts was error. *See, e.g.*, *Henry o/b/o V.E.W. v. Comm'r of Soc. Sec.*, 2019 WL 3974125, *4 (W.D.N.Y. 2019) ("[a]lthough the ALJ summarized the 2017 IEP in his decision, he

---

compl[ies] with rules, respond[s] to criticism, and respect[s] and take[s] care of the possessions of others." 20 C.F.R. § 416.926a(i).

failed to discuss the recommendations and findings in any meaningful way . . . the ALJ's failure to discuss the findings within the IEP which conflicted with his determination that [c]laimant had a less than marked limitations in the domains based on a lack of motivation and improvement with medications requires remand"); *Sabrina L. o/b/o T.L. v. Berryhill*, 2018 WL 6521760, *10 (W.D.N.Y. 2018) ("[t]he 2012 opinions of Dr. Duffy and Dr. Meyer are stale because more recent evidence revealed more significant limitations in [claimant's] functionality . . . [t]he ALJ thus erred in assigning these consultative opinions significant weight without adequately explaining how they were supported by substantial evidence in the record for the relevant period"); *Carson o/b/o J.D. v. Colvin*, 2014 WL 1746056, *6 (W.D.N.Y. 2014) ("the ALJ erred in affording significant weight to these [consultative] opinions because they were stale and conflicted with substantial evidence in the record . . . [t]he[] opinions necessarily do not include probative evidence, namely, records from [c]laimant's school produced in October and November 2010").

Remand is thus warranted for the ALJ to reweigh the medical opinion evidence and teacher questionnaires in light of K.R.W.'s subsequent behavioral and disciplinary issues, and to more adequately resolve conflicts in the record created by these significant issues, particularly in the domain of interacting and relating with others. In doing so, the ALJ should obtain more up-to-date evaluations of K.R.W.'s level of functioning.

## CONCLUSION

For the reasons set forth above, White's motion for judgment on the pleadings (Dkt. # 12) is granted, the Commissioner's motion for judgment on the pleadings (Dkt. # 15) is denied, and the matter is remanded for further proceedings consistent with this decision.

IT IS SO ORDERED.

_____
DAVID G. LARIMER
United States District Judge

Dated: Rochester, New York
October 4, 2019.